Slip Op. 18-164

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| T.B. WOOD'S INCORPORATED,<br><br>          Plaintiff,<br><br>    v.<br><br>UNITED STATES,<br><br>          Defendant,<br><br>    and<br><br>CHINA CHAMBER OF INTERNATIONAL COMMERCE'S *AD HOC* COALITION OF PRODUCERS AND EXPORTERS OF CERTAIN IRON MECHANICAL TRANSFER DRIVE COMPONENTS FROM THE PEOPLE'S REPUBLIC OF CHINA and POWERMACH IMPORT & EXPORT CO., LTD. (SICHUAN),<br><br>          Defendant-Intervenors. | Before: Timothy C. Stanceu, Chief Judge<br><br>Consol. Court No. 17-00022 |

## OPINION

[Sustaining negative determinations by the U.S. International Trade Commission in antidumping duty investigations of imports of certain iron mechanical transfer drive components from Canada and the People's Republic of China and a countervailing duty investigation of imports of certain iron mechanical transfer drive components from the People's Republic of China]

Dated: November 29, 2018

*Daniel B. Pickard*, Wiley Rein LLP, of Washington, D.C., argued for plaintiff T.B. Wood's Incorporated. With him on the brief were *Alan H. Price*, *Robert E. DeFrancesco, III*, and *Maureen E. Thorson*.

*Brian R. Soiset*, Office of the General Counsel, U.S. International Trade Commission, of Washington, D.C., argued for defendant U.S. International Trade Commission. With him on the brief were *Dominic L. Bianchi*, General Counsel, and *Andrea C. Casson*, Assistant General Counsel for Litigation.

*Jill A. Cramer*, Mowry & Grimson, PLLC, of Washington, D.C., argued for defendant-intervenors China Chamber of International Commerce's *ad hoc* Coalition of Producers and Exporters of Certain Iron Mechanical Transfer Drive Components From the People's Republic of China and Powermach Import & Export Co., Ltd. (Sichuan).  With her on the brief were *Jeffrey S. Grimson*, *Kristin H. Mowry*, *James C. Beaty*, and *Bryan P. Cenko*.

Stanceu, Chief Judge:  Plaintiff T.B. Wood's Incorporated ("T.B. Wood's") contests final negative injury and threat determinations made by the United States International Trade Commission (the "Commission" or "ITC") in antidumping duty investigations of imports of certain iron mechanical transfer drive components ("IMTDCs") from Canada and China and a parallel countervailing duty investigation of imports of these products from China.  The court sustains the contested determinations.

## I.  BACKGROUND

### A. The Contested Determinations

The Commission determined "that an industry in the United States is not materially injured or threatened with material injury . . . by reason of imports of certain iron mechanical transfer drive components from Canada and China . . . that have been found by the Department of Commerce ("Commerce") to be sold in the United States at less than fair value ("LTFV"), and that have been found by Commerce to be subsidized by the government of China."  *Certain Iron Mechanical Transfer Drive Components From Canada and China; Determinations*, 81 Fed. Reg. 91,198 (Int'l Trade Comm. Dec. 16, 2016) (footnotes omitted) ("*Final Determinations*"). Background on the investigations and the views of the Commission were published as *Certain Iron Mechanical Transfer Drive Components from Canada and China*, Inv. Nos. 701-TA-550 and 731-TA-1304-1305, USITC Pub. 4652 (Dec. 2016) (Final), *available at*

https://www.usitc.gov/publications/701_731/pub4652.pdf (last visited Nov. 13, 2018) ("*Views of the Commission*").[1]

In this case, plaintiff contests, on various grounds, the ITC's negative injury determinations, i.e., its separate negative injury determinations in the countervailing duty investigation and in the antidumping duty investigations, and the ITC's separate negative threat determinations in those investigations.

### B. The Plaintiff and Defendant-Intervenors

T.B. Wood's, a U.S. manufacturer of iron mechanical transfer drive components, was the petitioner in the investigations culminating in the Final Determinations.  T.B. Wood's alleged in its petitions, filed with Commerce and the Commission on October 28, 2015, that imports of certain IMTDCs from Canada and China were being sold in the United States at less than fair value and, in the case of imports from China, were being subsidized by the government of China. *See Certain Iron Mechanical Transfer Drive Components From Canada and China; Institution of Antidumping and Countervailing Duty Investigations and Scheduling of Preliminary Phase Investigations*, 80 Fed. Reg. 67,789 (Int'l Trade Comm'n Nov. 3, 2015) ("*Institution of Investigations*").  The petitioner alleged material injury or threat of material injury to the U.S. industry producing these components. *Id.*

There are two defendant-intervenors in this litigation: the China Chamber of International Commerce's *ad hoc* Coalition of Producers and Exporters of Certain Iron Mechanical Transfer

---

[1] USITC Pub. 4652 contains the public version of the Commissioners' views and the public version of the agency's Final Staff Report.  Confidential versions were released to parties under the agency's administrative protective order.  *See Confidential Views of the Commission* (Dec. 13, 2016) (C.R. Doc. 533) ("*Conf. Views of the Commission*"); Confidential version of the Final Staff Report, *Iron Mechanical Transfer Drive Components from Canada and China,* Inv. Nos. 701-TA-550 and 731-TA-1304-1305 (Nov. 8, 2016) (Final) (C.R. Doc. 521) ("*Final Staff Rep.*").

Drive Components from the People's Republic of China (the "Coalition"), and Powermach

Import & Export Co., Ltd. (Sichuan) ("Powermach"). The Coalition was formed by several

Chinese respondents, each a producer and exporter of the subject merchandise, that participated

in the final phase of the ITC's investigations, including Powermach, Shijiazhuang CAPT Power

Transmission Co., Ltd., and Yueqing Bethel Shaft Collar Manufacturing Co., Ltd. *Conf. Views*

*of the Commission* 4; *Views of the Commission* 4.

C. The Antidumping Duty and Countervailing Duty Investigations

Upon receiving the petitions from T.B. Wood's, the Commission initiated antidumping

duty ("AD") investigations of IMTDCs from Canada and China and a countervailing duty

("CVD") investigation of IMTDCs from China. *Institution of Investigations*, 80 Fed. Reg. at

67,790. The period of investigation ("POI") for each was the beginning of 2013 through the first

six months of 2016. The ITC analyzed annual data for 2013, 2014, and 2015 and also compared

data for "interim 2015," i.e., the first six months of 2015, with data for "interim 2016," i.e., the

first six months of 2016. This allowed the ITC to compare data for a six-month period prior to

the filing of the petition (which occurred in late October 2015) with data for a corresponding

period in 2016 occurring after the filing of the petition.

Prior to the ITC's final negative determinations, the International Trade Administration

of the U.S. Department of Commerce ("Commerce") concluded AD and CVD investigations that

resulted in affirmative less-than-fair-value and subsidy determinations on imports of the subject

merchandise from China. *Certain Iron Mechanical Transfer Drive Components From the*

*People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*,

81 Fed. Reg. 75,032 (Int'l Trade Admin. Oct. 28, 2016); *Countervailing Duty Investigation of*

*Certain Iron Mechanical Transfer Drive Components From the People's Republic of China:*

*Final Affirmative Determination*, 81 Fed. Reg. 75,037 (Int'l Trade Admin. Oct. 28, 2016).

Commerce also reached an affirmative less-than-fair-value determination on imports of the

subject merchandise from Canada. *Certain Iron Mechanical Transfer Drive Components From*

*Canada: Final Affirmative Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 75,039

(Int'l Trade Admin. Oct. 28, 2016) ("*Canada LTFV Determination*").

The Commission issued the Final Determinations on December 16, 2016. *Final*

*Determinations*, 81 Fed. Reg. at 91,198. The determinations were unanimous, with all six

commissioners voting. *Id.* at 91,198 n.3. As required by the Tariff Act of 1930, *as amended* (the

"Tariff Act"), the negative determinations by the ITC resulted in termination of the

investigations by Commerce and the ITC without the issuance of antidumping duty or

countervailing duty orders. *See* 19 U.S.C. §§ 1671d(c)(2) (termination of countervailing duty

investigation), 1673d(c)(2) (termination of antidumping duty investigation).[2]

D. Proceedings before the Court of International Trade

On February 10, 2017, T.B. Wood's brought actions in this court, now consolidated,

contesting the final negative determinations by the ITC.[3] Before the court is plaintiff's motion

for judgment on the agency record, filed under USCIT Rule 56.2. Pl.'s Mot. (Aug. 1, 2017),

ECF No. 25; Pl.'s Br. (Aug. 1, 2017), ECF Nos. 26 (conf.), 27 (public), 44 (revised conf.),

45 (revised public). Plaintiff's motion is opposed by defendant ITC and defendant-intevenors.

Def.'s Opp'n (Oct. 16, 2017), ECF Nos. 31 (conf.), 32 (public); Def.-Ints.' Opp'n

(Oct. 16, 2017), ECF Nos. 29 (conf.), 30 (public), 48 (revised conf.), 49 (revised public).

---

[2] All citations to the United States Code are to the 2012 edition.

[3] Consolidated under *T.B. Wood's Inc. v. United States* (Ct. No. 17-00022) is *T.B. Wood's Inc. v. United States* (Ct. No. 17-00013). Order (May 3, 2017), ECF No. 23.

Plaintiff replied on November 16, 2017. Pl.'s Reply (Nov. 16, 2017), ECF Nos. 35 (conf.), 36 (public), 46 (revised conf.), 47 (revised public). The court held oral argument on plaintiff's motion on February 22, 2018. ECF No. 41.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

The court exercises jurisdiction according to section 201 of the Customs Court Act of 1980, 28 U.S.C. § 1581(c), which grants jurisdiction over any civil action brought under section 516A of the Tariff Act, 19 U.S.C. § 1516a(a)(2)(B)(ii). Where, as here, a party seeks review of a final ITC determination reached under 19 U.S.C. §§ 1671d or 1673d, "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Furthermore, "[s]upport by substantial evidence is determined on the entirety of the record, taking into account the evidence that supports and the evidence that detracts from the agency's conclusion." *Siemens Energy, Inc. v. United States*, 806 F.3d 1367, 1369 (Fed. Cir. 2015) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

### B. Scope of the Antidumping Duty and Countervailing Duty Investigations

Under the Tariff Act, antidumping duties are imposed, in defined circumstances, on "foreign merchandise . . . being, or . . . likely to be, sold in the United States at less than its fair value." 19 U.S.C. § 1673(1). Countervailing duties are imposed, in defined circumstances, on "merchandise imported, or sold (or likely to be sold) for importation, into the United States" for which "the government of a country or any public entity within the territory of a country is

providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export" of that merchandise. *Id.* § 1671(a)(1).

The scope of an antidumping duty or countervailing duty investigation is determined by Commerce. Commerce described the subject IMTDCs as "[i]ron mechanical transfer drive components, whether finished or unfinished (*i.e.*, in blanks or castings)" and as being "in the form of wheels or cylinders" and "often referred to as sheaves, pulleys, flywheels, flat pulleys, idlers, conveyer pulleys, synchronous sheaves, and timing pulleys." *See Canada LTFV Determination*, 81 Fed. Reg. at 75,040-41. In its report, the Commission gave a general description of IMTDCs, as follows:

> IMTDCs are iron castings in the shape of wheels or cylinders for use in belted drive assemblies in fans, conveyers, compressors, pumps, and mixers. Circular IMTDCs may be referred to as sheaves, pulleys, or flywheels, and cylindrical IMTDCs, which are designed to attach the shaft to the circular IMTDC, may be referred to as bushings. Regardless of size or shape, IMTDCs are connected with belts and used to transfer power from a shaft operated by a motor or engine. IMTDCs may be produced in finished or unfinished (referred to as blanks or castings) form. IMTDCs may be manufactured in a variety of sizes as measured by the outer diameter.

*Conf. Views of the Commission* 15 (footnotes omitted); *Views of the Commission* 12 (footnotes omitted). The Commission added that "IMTDCs have a center bore hole for a shaft to be inserted and an outer circumference, with a variety of teeth or grooves, designed to mesh with a belt." *Conf. Views of the Commission* 15 n.35; *Views of the Commission* 12 n.35. IMTDCs are commonly used in belted drive shaft systems, where they function, in conjunction with other components, to transfer, store, and release power. *Final Staff Rep.* I-27. They have applications in various industries, including mining, oil extraction, manufacturing, and heating, ventilating, and air conditioning (HVAC). *Id.* at I-28 to I-31. Due to their wide range of end uses, IMTDCs are produced in various shapes and sizes.

Commerce limited the scope of the investigations to IMTDCs with a "maximum nominal outer diameter" of "not less than 4.00 inches." *Canada LTFV Determination*, 81 Fed. Reg at 75,041. The scope also is limited to articles made of iron with a carbon content equal to or greater than 1.7% by weight. *Conf. Views of the Commission* 9; *Views of the Commission* 7. Excluded were various products, including certain finished torsional vibration dampers ("TVDs"), certain light duty non-synchronous sheaves (fixed or variable pitch), certain IMTDC bushings, flywheels with ring gears, and certain TVD inner rings. *Conf. Views of the Commission* 10-11; *Views of the Commission* 8.

The process of manufacturing IMTDCs can be divided into two general phases. *Final Staff Rep.* I-27 to I-37. The first phase, the "casting" phase, requires design, mold making, iron melting, and casting of the molten iron, resulting in a casting of approximately the shape of the finished product. *Id.* at I-31 to I-35. In the second phase, finishing operations are performed on the casting to produce the specified size and physical characteristics. *Id.* at I-36 to I-37. This step may involve machining to produce grooves or teeth in the outer circumference or may involve other processes, such as drilling, balancing, broaching, and painting. *Id.*

C. The Commission's Role in the Imposition of Antidumping and Countervailing Duties

Before antidumping or countervailing duties may be imposed, the Commission must determine that an industry in the United States is materially injured or is threatened with material injury, or that the establishment of an industry in the United States is materially retarded, by reason of imports, or sales (or the likelihood of sales) for importation, of the merchandise Commerce has found to be unfairly traded, i.e., subsidized or dumped. 19 U.S.C. §§ 1671d(b)(1) (countervailing duties), 1673d(b)(1) (antidumping duties).

1. The Domestic Industry and the Domestic Like Product

Because it must determine whether an "industry in the United States" is materially injured or threatened with material injury, *id.* §§ 1671d(b)(1), 1673d(b)(1), the ITC identifies as part of its investigation the "domestic industry" or "industries" and the "domestic like product" or "products." The statute defines "industry" as "the producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product." *Id.* § 1677(4)(A). The statute defines "domestic like product" as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to investigation." *Id.* § 1677(10). The Commission may determine that there is a single domestic like product or that there are multiple like products. A finding of multiple like products requires a finding of corresponding domestic industries. *See id.* § 1677(4)(A).

In identifying the domestic like product or products, the Commission is not confined by the scope of an AD or CVD investigation as determined by Commerce. In the investigations at issue, the ITC found that there was one like product, which it defined more broadly than the scope as defined by Commerce. While Commerce excluded from the scope IMTDCs under 4 inches in nominal outside diameter, the ITC defined the domestic like product as "all forms of finished and unfinished IMTDCs described in the investigations' scope and including small-diameter IMTDCs under 4 inches in maximum nominal outside diameter." *Conf. Views of the Commission* 19; *Views of the Commission* 15. The Commission defined the domestic industry as "all U.S. producers of the domestic like product, including foundries manufacturing unfinished IMTDCs, firms engaged solely in machining unfinished IMTDCs into finished IMTDCs, and integrated producers of IMTDCs." *Conf. Views of the Commission* 29; *Views of the*

*Commission* 21. Before the court, plaintiff does not contest the ITC's determinations of the domestic like product or the domestic industry.

<u>2. Statutory Factors for the Material Injury Determination</u>

The Tariff Act defines "material injury" as "harm which is not inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A). Due to the statutory requirement of "causation," the ITC may reach an affirmative determination of material injury or threat of material injury only when the material injury or threat of material injury occurs "by reason of" the subject imports. *Id.* §§ 1671d(b)(1) (countervailing duties), 1673d(b)(1) (antidumping duties). The Commission is directed to consider three basic factors: the volume of imports of the merchandise subject to investigation ("import volume"), the effect of those imports on U.S. prices of the domestic like product or products ("price effects"), and the impact of those imports on domestic producers of the domestic like product or products, but only in the context of production operations in the United States ("impact on the domestic industry"). *Id.* § 1677(7)(B)(i). The statute provides further requirements as to what the Commission must consider for each of the three factors. *Id.* § 1677(7)(C)(i) (volume), (ii) (price effects), (iii) (impact on the domestic industry). Additionally, the Commission "may consider such other economic factors as are relevant." *Id.* § 1677(7)(B)(ii).

<u>3. Cumulation</u>

In making its injury determination, the ITC assesses together ("cumulates") the volume and effect of imports of the subject merchandise from all countries with respect to which petitions were filed on the same day (as occurred here), if such imports compete with each other and with domestic like products in the United States market. *Id.* § 1677(7)(G). The Commission "cross-cumulated" the subsidized and dumped imports from China with the dumped imports

from Canada in reaching its negative injury determination. *Conf. Views of the Commission* 34 &

n.114; *Views of the Commission* 24-25 & n.114.

In determining threat of material injury, the ITC in its discretion may cumulatively assess

the volume and effect of imports of the subject merchandise if such imports compete with each

other and with domestic like products in the United States market. *See* 19 U.S.C. § 1677(7)(H).

The Commission did not cumulate the Chinese and Canadian imports in performing its threat

analyses. *Conf. Views of the Commission* 75; *Views of the Commission* 53.

D. The Court Sustains the ITC's Determinations that Cumulated Subject Imports from Canada
and China Are Not Injuring the Domestic Industry

1. Plaintiff's Arguments Opposing the ITC's Negative Injury Determinations

Plaintiff makes five arguments in support of its claim contesting the Commission's

negative injury determinations.

T.B. Wood's first argues that the ITC failed "to reconcile its conclusion that there was no

correlation between subject imports and domestic industry performance with basic economic

logic." Pl.'s Br. 9-10. It maintains that this finding of a lack of correlation was irreconcilable

with the Commission's findings that "subject IMTDC's were present in large volumes

throughout the POI" and that "the subject goods pervasively undersold the domestic like

product." *Id.* at 11.

Plaintiff's second argument takes issue with the ITC's method of determining the relative

shares of the U.S. market occupied by subject merchandise and the domestic like product. As

discussed further below, plaintiff objects to the Commission's basing the denominators of its

percentage calculations on IMTDCs of all diameters while using numerators for subject

merchandise that excluded IMTDCs less than 4 inches in nominal diameter. *Id.* at 12-17. T.B.

Wood's submits that the ITC failed to explain adequately, or support with substantial evidence,

its conclusions regarding market share and failed even to acknowledge the "data reliability"

problem caused by the disconnect between the numerators and the denominators in its

percentage calculations. *Id.* at 13.

Third, plaintiff contends that the ITC failed to acknowledge a gap in the data it collected

on imported subject merchandise from China and failed to explain the basis for its decision "to

rely on the remaining data without adjustment, inclusive of addressing record evidence

suggesting that the missing data reflected large diameter (*i.e.*, subject) imports." *Id.* at 16

(footnote omitted). T.B. Wood's argues, further, that the ITC was required by 19 U.S.C. § 1677e

to attempt to fill the gap by means of facts otherwise available, either with or without an adverse

inference. *Id.* at 16 n.12.

Fourth, T.B. Wood's argues that the ITC's price-effects analysis was unsupported by

substantial evidence and inadequately explained. It contends that the Commission reached

invalid findings that subject imports, which undersold the domestic product, did not cause

significant price depression or price suppression and that the ITC failed to consider record

evidence detracting from the finding. *Id.* at 18-29. It submits that the data upon which the

Commission concluded that domestic prices fluctuated in the face of steady import pricing were

unrepresentative, being limited to two products. *Id.* at 21. Plaintiff also maintains that the ITC

failed to explain how its price-effects analyses could be valid despite the flaw that it alleges to

have affected the diameter-related data the ITC used in its market share analysis.

Finally, plaintiff argues that the ITC did not support or explain adequately its conclusions

regarding the impact of subject imports on the domestic industry. According to T.B. Wood's,

the Commission wrongly concluded that demand and cost trends, rather than subject imports,

accounted for the industry's poor performance over the POI. *Id.* at 31. It contends that the

Commission failed to acknowledge or discuss material record evidence inconsistent with the

Commission's conclusions, particularly evidence relating to supply considerations.

### 2. Plaintiff's "Economic Logic" Argument Misinterprets the Causation Requirement in the Tariff Act

T.B. Wood's argues that "the agency's determinations as a whole are tainted by its failure

to reconcile its conclusion that there was no correlation between subject imports and domestic

industry performance with basic economic logic." Pl.'s Br. 9-10. According to plaintiff, "[t]he

agency found that subject IMTDC's were present in large volumes throughout the POI,"

"characterized these volumes as significant on multiple bases," and "found that the subject goods

pervasively undersold the domestic like product." *Id.* at 11. T.B. Wood's maintains that "[w]ith

such a factual predicate, it should not be possible for there to be 'a lack of correlation' between

subject imports and the domestic industry's condition." *Id.* (citing *Views of the Commission* 47,

55, 60-61). Plaintiff describes the ITC's conclusions as "unexplained and unsupported by reason

of this failure to acknowledge fundamental economic principles, or to explain how a decision

that ignores such principles can be consistent with law." *Id.* at 12.

The court rejects plaintiff's "economic logic" argument, which disregards the effect of

the causation requirement in the statute. An affirmative injury determination requires a finding

that material injury to the domestic industry occurred "by reason of" the subject merchandise.

19 U.S.C. §§ 1671d(b)(1), 1673d(b)(1). Although the Tariff Act directs the ITC to "consider"

the factors of import volume, price effects, and impact on the domestic industry (all of which the

ITC considered in the investigations), the statute does not require the ITC to *presume* that the

presence in the U.S. market of competing imports, at significant volumes and at prices that in

most comparisons undersold the domestic like product, is itself sufficient to support a finding of

causation, regardless of other evidence of record. In this case, according to other record

evidence, the volume of the subject imports did not show a sustained pattern of increasing significantly throughout the POI and the share they occupied of the U.S. market remained relatively steady over the POI as a whole. No less significant was the Commission's finding, supported by record evidence consisting of questionnaire responses, that price was not the only factor, and not always even the most important factor, in purchasing decisions. The Commission found that "purchasers cited quality most frequently as the most important factor (7 firms), followed by price (5 firms), whereas price was the most frequently reported second- and third-most important factor (5 firms each)." *Conf. Views of the Commission* 49 (citing *Final Staff Rep.* Table II-5); *Views of the Commission* 34 (citing *Final Staff Rep.* Table II-5). "Purchasers also reported that 'quality meets industry standards,' 'availability,' 'product consistency,' 'reliability of supply,' and 'delivery time' were important factors in their purchasing decisions." *Conf. Views of the Commission* 49 (citing *Final Staff Rep.* Table II-6); *Views of the Commission* 34 (citing *Final Staff Rep.* Table II-6).

### 3. The Commission's Method of Measuring Relative Market Share Did Not Depend on Unreliable Data

The Commission found one domestic industry producing one domestic like product, which it did not limit by diameter. Instead, it determined that the domestic like product included the larger-diameter IMTDCs that are within the scope of the investigation and also IMTDCs under 4 inches in nominal diameter, which Commerce excluded from the scope. *See Conf. Views of the Commission* 19; *Views of the Commission* 15. Commerce made the small-diameter scope exclusion in response to a proposal made by the petitioner, T.B. Wood's. *Conf. Views of the Commission* 9; *Views of the Commission* 7. For the purpose of comparing the shares of the U.S. market occupied by the subject imports and the domestic like product, the ITC calculated the size of the U.S. market, i.e., the denominators of its market share calculations, based on apparent U.S.

consumption of IMTDCs of all diameters, from all sources. *Conf. Views of the Commission* 44

("During the POI, the U.S. IMTDCs market was supplied by the domestic industry, subject

imports, imports of large-diameter IMTDCs from nonsubject sources, and imports of small-

diameter IMTDCs from subject and nonsubject countries." (citing *Final Staff Rep.* Table IV-7));

*Views of the Commission* 31 (same (citing *Final Staff Rep.* Table IV-7)).

Before the court, T.B. Wood's does not contest the ITC's including both large- and

small-diameter IMTDCs in the domestic like product. Nevertheless, plaintiff argued in its

Rule 56.2 brief that the Commission's method of determining the relative market shares of the

subject imports and the domestic industry presented "data reliability issues" because of "the

disconnect between the numerators and the denominators of the equation, occasioned by the fact

that subject merchandise comprised only large-diameter IMTDCs, while the domestic like

product included IMTDCs of all sizes." Pl.'s Br. 13. The "data reliability issues" arose,

according to T.B. Wood's, because "subject import market share was based on the ratio of only

large-diameter import shipments, over a denominator comprised of U.S. and import shipments of

all sizes of IMTDCs." *Id.* at 13-14. Plaintiff objected that the ITC "failed to acknowledge that

the numerators for its calculations of subject and domestic market share were on distinct bases,

or to explain how it could rely on the accuracy of market share calculations that were made in

this manner." *Id.* at 14.

In its response brief, the ITC argued that T.B. Wood's did not exhaust its administrative

remedies on the market share numerator/denominator issue, not having objected to the ITC's

method of data collection or market share methodology during the investigation. Def.'s Br. 16

("[A]t no point did Plaintiff suggest that the Commission should collect different data" or "argue

that the Commission should alter its standard methodology for calculating apparent U.S.

consumption and market shares."). Responding in its reply brief to the Commission's "failure to exhaust" argument, T.B Wood's clarified that it is not challenging "the agency's market share calculation methodology" and instead "argues that, consonant with the substantial evidence standard, the agency was required to acknowledge the limits of its data, including the tendency of the market share calculation methodology to reduce subject imports' market share as compared with a methodology in which both the numerator and denominator are calculated on the same basis." Pl.'s Reply 14. Plaintiff adds that "[s]uch acknowledgement was crucial given the agency's heavy reliance on market share shifts." *Id.*

Plaintiff submits that its argument, which it narrowed in the reply brief in response to defendant's "failure to exhaust" objection, is not contesting the ITC's methodology for measuring relative market share. But the gist of plaintiff's argument is still that the court should call that methodology into question and hold unreasonable the ITC's reliance on it, or at least the ITC's explanation for its reliance. Because plaintiff characterizes its argument as "consonant with the substantial evidence standard" and directs it to the Commission's explanation, rather than argue that the ITC's data collection was flawed, the court considers the argument on the merits rather than dismissing it on grounds of failure to exhaust administrative remedies. But in doing so, the court concludes that the argument lacks merit.

Plaintiff attempts to support its argument by referring to the substantial evidence standard, but even this narrowed argument relates more to the choice of methodology rather than to the presence or absence of record evidence supporting specific findings of fact. Even when considered as a "substantial evidence" argument, it cannot overcome the state of the record evidence, which on the whole reflected that small-diameter IMTDCs were nonsubject merchandise and that all diameters of IMTDCs were included in the domestic like product. And

because the ITC satisfactorily explained its methodology, the court cannot agree with plaintiff

that the ITC acted contrary to law by failing to "acknowledge the limits of its data." Nor is the

court convinced that the data presented "reliability issues." Rather than being "limited" or

"unreliable," the record data allowed the Commission to determine the share of the aggregate

U.S. market that was occupied by *subject* imports, which in this investigation necessarily were

limited to the cumulated imports of large-diameter IMTDCs from Canada and China. Consistent

with its obligation to consider the impact on the domestic industry of the subject imported

merchandise as distinguished from that of nonsubject imported merchandise, *see Conf. Views of*

*the Commission* 56-57; *Views of the Commission* 40-41, the Commission, logically and

reasonably, included both subject and nonsubject imports in its measurement of the volume of

the aggregate U.S. market.

 4. The ITC's Findings Were Not Invalidated by what Plaintiff Characterizes as "Missing Data"

         Plaintiff's next two arguments address what plaintiff characterizes as "the lack of any

information from importers accounting for the majority of Chinese imports" of IMTDCs,

resulting from the failure of some importers to submit responses to the ITC's questionnaires. *See*

Pl.'s Br. 16 (footnote omitted). According to T.B. Wood's, the estimated coverage of the

submitted questionnaires was only 40% of Chinese imports. Plaintiff contends, first, that the

ITC failed to acknowledge that there was a gap in the data it collected on imported merchandise

and failed to explain the basis for its decision "to rely on the remaining data without adjustment,

inclusive of addressing record evidence suggesting that the missing data reflected large diameter

(*i.e.*, subject) imports." *Id.* (footnote omitted). T.B. Wood's argues, further, that the ITC was

required by the Tariff Act to attempt to fill the gap in record information by resorting to its

authority to use "facts otherwise available" as provided for in 19 U.S.C. § 1677e(a), possibly

with an adverse inference as provided for in 19 U.S.C. § 1677e(b). *Id.* at 16 n.12.

The Final Staff Report explained that the ITC issued questionnaires to companies that

together accounted for "61.0 percent of the total value of imports from all countries under *the*

*three primary HTS provisions identified by petitioner.*" *Final Staff Rep.* IV-3 (emphasis added).

These statistical reporting numbers from the Harmonized Tariff Schedule of the United States

("HTSUS") are 8483.50.6000, 8483.50.9040, and 8483.90.8080. *Id.* As the Final Staff Report

noted, the petition acknowledged that the three identified HTSUS provisions likely included both

subject and nonsubject imports. *Id.* The report states that "[c]ompanies that responded to the

Commission's questionnaires, either with data or by certifying that they did not import the

subject merchandise, accounted for the following shares of 2015 imports (by value) *under those*

*provisions* . . . : China, 40.0 percent." *Id.* (emphasis added). Accordingly, the 40% figure cannot

be taken to refer to the data coverage of *subject* IMTDCs imported from China. Because not all

imports from China under the tariff provisions can be shown to be subject imports, the data

"gap" plaintiff identifies does not support a conclusion that the ITC could not rely on the data

obtained from the questionnaires.

Plaintiff's second argument fares no better. Under the Tariff Act, "if . . . *necessary*

information is not available on the record," then the Commission "shall . . . use the facts

otherwise available in reaching the applicable determination." 19 U.S.C. § 1677e(a)(1)

(emphasis added). T.B. Wood's has not shown that the Commission lacked necessary

information, nor does it identify what information the ITC could have or should have used as

facts otherwise available.

5. The ITC's Negative Findings on Price Depression and Price Suppression Are Supported by Substantial Record Evidence

In evaluating the price effects of imports of subject merchandise, the ITC must consider whether the effect of the imports "depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree." 19 U.S.C. § 1677(7)(C)(ii)(II). The ITC reached negative findings on price depression and price suppression.

T.B. Wood's contends that the ITC's price-effects analyses (both as to price depression and price suppression) impermissibly relied on the Commission's market share conclusions, which T.B. Wood's argues were flawed due to unreliable data used to calculate market share, the ITC having captured subject imports in the numerators and the aggregate U.S. market in the denominators. Pl.'s Br. 20. The court rejects this argument because, as discussed above, the Commission's method of calculating relative market shares was not in error.

As to price depression, the Commission found "that cumulated subject imports from Canada and China did not depress prices of the domestic like product to a significant degree." *Conf. Views of the Commission* 58; *Views of the Commission* 41. In support of this ultimate finding, the ITC found that "[p]rices of domestically produced IMTDCs showed no clear trend during the POI." *Conf. Views of the Commission* 58; *Views of the Commission* 41. T.B. Wood's takes issue with this finding, arguing that "[w]hile there were certainly fluctuations in unit prices from quarter to quarter—which is not particularly surprising in a competitive market—the record also shows a downward pricing trend over time for the majority of the U.S[.]-produced products." Pl.'s Br. 21. Substantial record evidence supports the Commission's finding of "no clear trend" in domestic pricing and its ultimate negative finding on price depression. The ITC compiled and analyzed quarterly weighted-average price data and quantity data for six large-

diameter IMTDC products (four sheaves and two bushings) that were sold domestically to distributors or end users and also were imported. *Final Staff Rep.* V-8. Regarding product selection, the ITC explained that "[b]ased on information provided by the petitioner in its comments on the draft questionnaires, the Commission's staff selected the five largest volume products for TBW [T.B. Wood's] and Martin Sprocket [another U.S. producer] as well as a sixth product." *Conf. Views of the Commission* 55 n.203; *Views of the Commission* 39 n.203. The data showed no clear or consistent correlation between the domestic prices and quantities and the imported prices and quantities for any of the six products that could support a finding of price depression. *See Final Staff Rep.* Figures V-3a, V-4a, V-4b, V-7a, V-7b, and V-8a. By selectively highlighting several data points and calculating weighted annual average prices, T.B Wood's attempts to show that the ITC's negative price depression finding is contradicted by individual instances of comparatively lower or falling prices for the domestic products in some comparisons. *See* Pl.'s Br. 21-23. Plaintiff's individual comparisons fail to refute the ITC's general conclusion that the prices of the domestically produced IMTDCs did not show a clear trend. Some of the domestic prices (specifically, for two of the products) fluctuated significantly over the POI while prices for the others did not, but overall there was no consistent pattern for any of the six products that could be correlated with the imported IMTDCs so as to demonstrate that subject imports caused a reduction in prices for the domestic goods. Plaintiff's argument that the "fluctuation" was demonstrated by what it characterizes as unrepresentative data (i.e., data for only two products) does not refute the critical point that the record evidence does not show the "downward pricing trend over time" that plaintiff submits is characteristic of a majority of the products the Commission examined. *See Final Staff Rep.* Figures V-3a, V-4a, V-4b, V-7a, V-7b, and V-8a.

On the statutory criterion of whether the effect of the subject imports "prevents price increases, which otherwise would have occurred, to a significant degree" ("price suppression"), 19 U.S.C. § 1677(7)(C)(ii)(II), the ITC reached a negative finding upon considering the domestic industry's ratio of cost of goods sold ("COGS") to net sales. The Commission found that this ratio was "steady throughout most of the POI" and was lower in interim 2016 than in interim 2015. *Conf. Views of the Commission* 59; *Views of the Commission* 42; *see Final Staff Rep.* VI-3-VI-4, Table VI. The ITC noted that an increase in the ratio occurring in one of the years of the POI (2015), which the record showed was small on a percentage basis, "occurred as apparent U.S. consumption declined." *Conf. Views of the Commission* 59; *Views of the Commission* 42.

Substantial evidence supports the Commission's finding that the cost increase in 2015 coincided with a decline in overall demand in the U.S. market ("apparent U.S. consumption"). *See Final Staff Rep.* Table C-1. While not contesting this finding, plaintiff argues, in effect, that the presence of the unfairly traded imports, at prices that undersold the domestic like product, caused significant price suppression. It recounts that it argued in the investigation, and that the ITC failed to refute, "that subject imports, which continuously sold [*sic*] large volumes of IMTDCs into the U.S. market at prices that undersold the domestic like product, forced the U.S. industry out of large-volume products, and otherwise increasingly prevented the industry from realizing price increases sufficient to cover rising unit costs." Pl.'s Br. 25 (citing *Views of the Commission* 42). T.B. Wood's specifically refers to selling, general, and administrative costs but alludes to costs generally. *Id.* at 26. But T.B. Wood's fails to identify record evidence sufficient to compel a conclusion that subject imports caused a significant degree of price suppression. Plaintiff suggests that the ITC should have viewed the presence of the lower-priced subject imports in the domestic market as placing the domestic industry in a "cost price squeeze," but

data for the POI as a whole did not show an overall environment of what plaintiff characterizes as "rising unit costs." *See id.* at 24-25. Moreover, the relatively steady COGS to net sales ratio occurred in a situation in which "there was no appreciable decline in the domestic industry's market share nor an appreciable increase in the market share for the subject imports." *Conf. Views of the Commission* 60 (footnote omitted); *Views of the Commission* 42-43 (footnote omitted).

Alluding to its argument before the Commission that imports can injure a U.S. industry "by starting in the lower end of the market, gaining customer contacts, experience and knowledge, and eventually thrust themselves increasingly into higher-end, higher value goods," T.B. Wood's maintains that the ITC did not confront this argument adequately during the investigation, responding only that small diameter IMTDCs were nonsubject merchandise. Pl.'s Br. 28. The record here did not show that cumulated subject imports increased significantly by unit value over the course of the POI and in fact showed a general decline. *See Final Staff Rep.* Table C-1. While Canadian subject imports increased in unit value, the Chinese subject imports, which were much greater than Canadian subject imports both in terms of quantity and value, decreased by unit value in each full year of the POI and did not appreciably increase in unit value in interim 2016. *See id.*

In summary, the ITC's negative findings on price depression and price suppression are supported by substantial evidence, having been reached upon an analysis of the record evidence for the POI as a whole.

6. The ITC Permissibly Reached a Negative Finding on the Impact of Subject Merchandise on the Domestic Industry

The ITC found that "cumulated subject imports from Canada and China did not have a significant impact on the domestic industry during the POI." *Conf. Views of the Commission* 61

(footnote omitted); *Views of the Commission* 44 (footnote omitted). The Commission acknowledged that "the domestic industry's financial performance was poor throughout the POI," but it found temporal correlations between various indicia of the industry's financial condition and changes in demand (measured by apparent U.S. consumption), including the notable reduction in demand that occurred in 2015, which coincided with an increase in costs (measured by the COGS to net sales ratio). *Conf. Views of the Commission* 63; *Views of the Commission* 45. The ITC noted that overall "apparent U.S. consumption fluctuated during the POI; it increased from 2013 to 2014, decreased between 2014 and 2015, and was lower in interim 2016 than in interim 2015." *Conf. Views of the Commission* 61-62 (footnote omitted); *Views of the Commission* 44 (footnote omitted). The Commission observed that "[m]any of the domestic industry's performance indicators mirrored these changes in apparent U.S. consumption over the POI *and are not otherwise explained by trends in cumulated subject imports*." *Conf. Views of the Commission* 62 (emphasis added); *Views of the Commission* 44 (emphasis added). All of this occurred, the ITC noted, while the domestic industry's share of apparent U.S. consumption remained relatively unchanged over the course of the POI.

The Commission's negative findings on the impact of subject imports on the domestic industry are supported by substantial record evidence. From the data compiled by the ITC staff, the Commission readily could see that a number of changes in the indicia of the industry's condition, including indicia on overall profitability, correlated temporally with changes in demand (measured by apparent U.S. consumption) but not with changes in the volume of cumulated subject imports. *See, e.g., Final Staff Rep.* Table C-1. Instead, cumulated subject imports declined with the 2015 reduction in demand. By value, they increased 4.6% from 2013, the first year of the POI, to 2014 but then declined 8.8% from 2014 to 2015, coinciding with the

lowered demand occurring at that time. *See id.* As the Commission found, "[i]n terms of pieces, the domestic industry's production, capacity utilization, U.S. shipments, and net sales all followed a similar trajectory; they increased from 2013 to 2014, decreased from 2014 to 2015, and were lower in interim 2016 than in interim 2015." *Conf. Views of the Commission* 62 (footnote omitted); *Views of the Commission* 44 (footnote omitted). The record data supported the ITC's conclusions that "[c]umulated subject imports followed similar trends, and the domestic industry's share of apparent U.S. consumption showed little change over the POI." *Conf. Views of the Commission* 62 (footnote omitted); *Views of the Commission* 44 (footnote omitted).

In challenging the Commission's negative finding on the impact of subject imports on the domestic industry, T.B. Wood's relies again on its argument that the ITC used unreliable data in measuring relative market share. Pl.'s Br. 31. Because, as the court discussed above, the ITC reasonably compared the share of domestic consumption occupied by subject imports with that occupied by the domestic industry's sales of the domestic like product, this argument must be rejected.

T.B. Wood's next argues that the Commission failed to consider evidence detracting from its conclusion that subject imports were not a significant cause of the condition of the U.S. industry. *Id.* In doing so, plaintiff states that it "does not contest that demand and cost trends influenced domestic performance over the POI," conceding that "such trends are relevant to the performance of any industry at any time." *Id.* Thus, while not disputing that the reduction in overall demand, and with it increased unit costs, had negative effects,[4] plaintiff insists that

---

[4] Although making this concession, plaintiff's brief mischaracterizes certain information in the confidential version of the Final Staff Report that plaintiff cites in support of its argument. (continued . . .)

neither changes in demand, nor the changes in unit costs that the ITC correlated with them, fully

explain the domestic industry's condition and that "[s]omething else is affecting performance."[5]

*Id.* at 33. In identifying that "something else," plaintiff points to "the constant pricing pressure

of large volumes of subject imports that pervasively undersold the domestic like product." *Id.*

Stated summarily, plaintiff's argument is that the ITC looked at the effects of changes in demand

without also looking at what plaintiff terms "supply." *Id.* at 34. According to T.B. Wood's, "in

analyzing the health of the domestic industry, the ITC examined demand conditions but failed to

provide a meaningful analysis of supply conditions—most particularly the significant volumes of

fungible, lower-priced subject IMTDCs." *Id.* This is essentially a restatement of plaintiff's

"economic logic" argument. But as the court has explained, the Tariff Act does not compel the

ITC to presume causation solely from the sustained presence in the market of significant

volumes of subject imports that pervasively undersold the domestic like product. As the

Commission permissibly found, a factor other than subject imports—reduced demand and

concomitant increased unit cost—correlated temporally with changes in the industry's condition

whereas import volumes did not. The Commission also considered that price was not the sole

(. . . continued)

*See* Pl.'s Br. 32 (mischaracterizing the change in domestic shipment levels from 2013 to 2015 as presented in *Final Staff Rep.* Table C-1 and also mischaracterizing the change in U.S. consumption as expressed in value, but not as expressed in quantity by pieces).

[5] Plaintiff also relies on data in the confidential version of the Final Staff Report pertaining to the domestic industry's condition in interim (January to June) 2016 in an attempt to show that the ITC wrongly attributed effects on the domestic industry to demand reduction and accompanying cost increases. *See* Pl.'s Br. 32-33. Those data pertain to a time period following the filing of the petition (in late October 2015). Subject imports were significantly lower in interim 2016 than in interim 2015.

determinant in purchasing decisions and that the domestic industry's share of the market for the domestic like product did not change materially over the course of the POI.

Plaintiff argues that "there is an evidentiary and logical gap in the agency's conclusion that domestic industry performance was fully attributable to demand and cost trends." Pl.'s Br. 34. This mischaracterizes the ITC's impact finding. The ITC did not say that the industry's performance was "fully attributable" to demand and cost trends. The ITC understood, and stated, that the industry's condition was poor throughout the POI. *Conf. Views of the Commission* 63; *Views of the Commission* 45. Its finding was that "cumulated subject imports . . . did not have a *significant* impact on the domestic industry *during the POI*." *Conf. Views of the Commission* 61 (emphases added); *Views of the Commission* 44 (emphases added). In support of that ultimate finding, the Commission found, consistent with record evidence, that many of the domestic industry's performance indicators "mirrored," i.e., correlated temporally with, "changes in apparent U.S. consumption over the POI and are not otherwise explained by trends in cumulated subject imports." *Conf. Views of the Commission* 62; *Views of the Commission* 44.

### E. The Court Sustains the ITC's Negative Threat Determinations

### 1. Statutory Factors for the Threat Determination

The Tariff Act lists eight specific economic factors that the Commission must consider in making a threat determination. Summarized briefly, these eight specific factors are: (1) the nature of any countervailable subsidy involved and whether imports of the subject merchandise are likely to increase; (2) unused production capacity, or imminent substantial increase in production capacity, in the exporting country; (3) a significant rate of increase of the volume or market penetration of imports of subject merchandise; (4) whether subject imports are entering at

prices likely to have a significant depressing or suppressing effect on domestic prices, and are likely to increase demand for further imports; (5) inventories of subject merchandise; (6) potential for product-shifting if production facilities in the foreign country used to produce other products can be used to produce subject merchandise; (7) product-shifting for agricultural products (not relevant here); and (8) actual and potential negative effects on existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product. *Id.* § 1677(7)(F)(i)(I)-(VIII).

The statute adds a ninth, more general, factor that directs the Commission to consider any other demonstrable adverse trends indicating the probability of material injury by reason of subject imports. *Id.* § 1677(7)(F)(i)(IX). The presence or absence of any of the named factors "shall not necessarily give decisive guidance with respect to the determination," which "may not be made on the basis of mere conjecture or speculation." *Id.* § 1677(7)(F)(ii).

### 2. Plaintiff's Arguments Challenging the ITC's Negative Threat Determination

T.B. Wood's first challenges the ITC's decision to analyze Canadian and Chinese imports separately rather than cumulate these imports for purposes of the threat analysis. Pl's Br. 36. Plaintiff also contends that the agency's separate negative threat determinations with respect to the two individual countries must remanded for further consideration and explanation. As to Canada, plaintiff contends, in support of both its cumulation argument and its threat argument, that the ITC placed too much reliance on the 2016 closure of the largest Canadian exporter of subject IMTDCs, ignoring the prospect that unfinished IMTDCs still could threaten the domestic industry. Regarding China, T.B. Wood's relies on some of its previous arguments but also argues that the importance of the United States as an export market to Chinese IMTDC producers indicates a threat of increased subject imports.

3. The ITC Permissibly Declined to Cumulate Subject Imports for its Threat Analysis and Permissibly Reached a Negative Threat Determination on Subject Imports from Canada

Under the statute, the Commission, "[t]o the extent practicable . . . *may* cumulatively assess the volume and price effects of imports of the subject merchandise from all countries with respect to which . . . petitions were filed under section 1671a(b) or 1673a(b) of this title on the same day . . . if such imports compete with each other and with domestic like products in the United States market." 19 U.S.C. § 1677(7)(H) (emphasis added). In deciding whether to cumulate for threat purposes, the Commission considers whether subject imports from the countries involved are likely to compete under similar conditions in the domestic market in the imminent future. *See Conf. Views of the Commission* 68; *Views of the Commission* 49. In this investigation, the ITC found they would not. *Conf. Views of the Commission* 68; *Views of the Commission* 49.

The ITC based its negative cumulation decision, as well as its negative threat determination as to Canada, largely on its finding that "the largest source of subject imports from Canada during the POI (Baldor Canada) closed its St. Claire, Quebec facility on May 27, 2016 and relocated its finishing equipment from Canada to the Baldor facilities in Weaverville and Marion, North Carolina." *Conf. Views of the Commission* 68; *Views of the Commission* 49. Plaintiff does not dispute this finding but, noting that Baldor Canada was merely a finisher of IMTDCs, argues that "a significant amount of Canadian castings . . . would suddenly be without a home by reason of Baldor Canada's closure." Pl.'s Br. 37. T.B. Wood's argues that the ITC failed to consider "how Canadian castings would be sold (and where) given Baldor's closure." *Id.* This argument rests entirely on speculation, not record evidence. The ITC was not required to presume, in the absence of any supporting record evidence, that the unfinished castings to which plaintiff refers, or finished IMTDCs made from them, in the imminent future would be

subject imports that threaten the domestic industry. As the statute instructs, the Commission's threat determination "may not be made on the basis of mere conjecture or speculation." 19 U.S.C. § 1677(7)(F)(ii). Rather than provide support for plaintiff's speculation, the evidence of record supports, with substantial evidence, the Commission's separate negative threat determination as to Canada. The Commission quite reasonably concluded that "the closure of the largest source subject merchandise from Canada has fundamentally altered how any IMTDC industry will compete in the U.S. market in the imminent future." *Conf. Views of the Commission* 75; *Views of the Commission* 53. Based on questionnaire responses from various parties, the ITC concluded, specifically, that "Baldor Canada accounted for nearly all known imports of subject merchandise during the POI, and there is no indication that another firm in Canada will export meaningful volumes of unfinished or finished IMTDCs to the United States in the imminent future." *Conf. Views of the Commission* 72 (footnote omitted); *Views of the Commission* 51 (footnote omitted). Because they are based on the record information on the closure of the Baldor Canada facility and the questionnaire data the ITC reviewed, the Commission's decision not to cumulate subject Canadian and Chinese IMTDC imports for threat purposes, and its negative threat determination as to the subject Canadian imports, are supported by substantial evidence.

#### 4. The ITC Permissibly Reached a Negative Threat Determination on Subject Imports from China

T.B. Wood's argues that the ITC's separate negative threat determination for China should be remanded for further consideration and explanation. Pl.'s Br. 39. For this, plaintiff relies again on its earlier arguments on the ITC's measurement of market share, present price effects and impacts of subject imports, "missing" data relating to Chinese subject merchandise, and the ITC's supposed obligation to use facts otherwise available as a substitute for those data.

*See id.* at 39-41. All of these arguments are flawed for the reasons the court discussed previously, and thus they can lend no support to plaintiff's challenge to the ITC's negative threat determination as to China.

Plaintiff next argues, unconvincingly, that the data on the home market and export shares of Chinese production of IMTDCs detract from the ITC's negative threat finding by signifying the importance of the U.S. market to Chinese producers and by also signifying "greater export pressure" on them. *Id.* at 40 (citing *Final Staff Rep.* VII-14, Table VII-6). These arguments are speculative at best, particularly in light of the trends the record data showed: over the POI, Chinese subject imports maintained a relatively stable share of the U.S. market while the share of Chinese production exported to the United States declined substantially. *See Conf. Views of the Commission* 85 ("[S]ubject imports from China maintained a relatively stable share of the U.S market and . . . the United States accounted for a declining share of the Chinese industry's total shipments of IMTDCs (less than one-third)."); *Views of the Commission* 59 (same).

Plaintiff also points to volume and market share of Chinese subject imports in an attempt to make the most of relatively small changes in the reported numbers over the course of the POI. *See* Pl.'s Br. 40. For this argument, plaintiff cites the data in Table C-1 of the confidential version of the Final Staff Report, *see id.*, but the data presented therein on the magnitude and relative market share of the subject imports over the POI do not support T.B. Wood's argument. According to the data, Chinese subject import volumes and market share, as measured by value, did not show a steady upward trend over the course of the POI. *See Final Staff Rep.* Table C-1. The total value of subject imports from China declined, and Chinese imports maintained a relatively steady share of the domestic market, over the POI. *Id.*

In summary, the ITC permissibly concluded, on the basis of substantial record evidence, that the domestic industry was not threatened with material injury by reason of subject imports of IMTDCs from China.

### III. Conclusion

The court concludes that the Commission's negative determinations on injury and threat to the domestic industry are supported by substantial evidence. Accordingly, the court will deny T.B. Wood's motion for judgment on the agency record and enter judgment in favor of defendant.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Chief Judge

Dated: November 29, 2018
New York, New York